Our next case this morning is City of Cambridge Retirement v. Ersek, No. 17-1381. Counsel, you may proceed. Good morning, Your Honors. My name is Jeroen van Klaarwegen from Bernstein-Litowitz on behalf of the appellants. With the Court's permission, I will try to reserve three minutes at the end of my argument. Thank you for hearing our appeal, Your Honors. There are three critical facts that make this case unique. The first fact is the Board here admitted that they knew about the consent degrees with New York, California, and Arizona before 2010. The second critical fact is that the Board admitted that they knew they had a duty to improve Western Union's compliance and implement an effective AML compliance program in order to make sure that Western Union would comply with the law. It's not in dispute. The third critical fact that is not in dispute is that despite the fact that the Board knew since February 2010 that they had an obligation to implement effective AML compliance program, the company, the company, not some employees, the company continued to violate the law by willfully not implementing an effective AML compliance program. Let me, I want to deal with a couple of preliminary questions. The first is standard of review. Are we looking at this de novo or abuse of discretion? So, Your Honor, in the Zack case, you decided not to reach that issue. I think that the Second Circuit case in Diamond that was cited in the papers explains really well why I think it is de novo review. This Court, like the Second Circuit, reviews PSRA cases and the motion to dismiss also de novo. And so I think there's a very good argument why this would be de novo review. What about DeHaas v. Empire Petroleum Company? I mean, there, I mean, that's a published decision. And we said that futility pleadings under Rule 23.1 is an issue that lies within the sound discretion of the Court. And we affirmed because we found nothing in the trial record that would indicate an abuse of discretion. That sounds like we've already decided it's an abuse of discretion. I'm not sure that it was squarely raised on appeal, Your Honor. And as we laid out in our papers, the Ninth Circuit is still an abuse of discretion standard. And Rosenblum is a good example of that. And we believe that, again, in this case, Your Honors, don't need to decide this issue because we believe this appeal should be granted either under an abuse of discretion standard or on a de novo review standard. Okay. And then my second question before we get into the meat of it, when we're looking at futility, which composition of the board are we looking at? Right. And the composition of the board as of the time of the first amended complaint, Your Honor. That was in May 2016. And why the first amended complaint? Because at that point in time, we added new allegations and not new claims, but new allegations that arguably changed the nature of the case. At that point, we had a selection of 220 documents, not all and not complete. But we added that and fairly stated we added some substance to the complaint. The second amended complaint, Your Honor, did not add any new claims, did not add any new allegations other than allegations that confirmed prior claims. And if you look at the Babbitt case that was cited in our papers, under those circumstances, you do not say, well, you have to make a new demand because you're not really changing the nature of your case. Well, let me ask you this. At the time of the first amended complaint, Mr. Levinson had already announced, it was already announced that he was leaving the board, right? I believe that was the second amendment. Is that the second amendment? Yes. So we have to, in order to decide, the first amended complaint was dismissed, correct? That is correct, Your Honor. So we can't look to a complaint that's been dismissed, can we? You can, Your Honor. And so there's the Park employees versus Smith case. And the issue really here is this. If you have a situation where a plaintiff brings a case and they know that certain board members are going to retire and they rush to the court, they're filing it quickly now because I want to keep that director in. Courts say no, right? That's the Smith case. Here, what we had was a very different situation. The court ordered us, this is the second amendment complaint. But the court ordered you because you didn't adequately plead. It's not the court's fault that the complaint failed on a motion to dismiss. Actually, that's not entirely right, Your Honor, because what happened is there was a first amended complaint that was dismissed. We then filed a supplement with the new allegations because the DPA came out. And in response to the supplement, the court said, you know what, I want a second amended complaint. So it was not in response to the first amended complaint to dismiss, so it was actually in response to the supplement that we filed. And at that point in time, we had no idea that Levinson was going to retire. Well, a dismissed complaint is still a dismissed complaint, isn't it? Yes, Your Honor. I'm really responding to your point that, you know, it wasn't the fault of the court. It was nobody's fault, quite honestly. We filed a supplement as soon as the DPA came out. We first filed a notice of supplemental authority. We then filed a supplement, 13 paragraphs. And in response to that supplement, the court said, you know, I want you to file a second amended complaint. And if you look at the red line for the second amended complaint, it literally is nothing other than taking the 13 paragraphs that we had put in the supplement first, adding them to the complaint. We made no other changes. And I'm assuming that the reason that it's very important to you to focus on the first amendment complaint is that if we look at the second amended complaint, there was 10 days that Levinson was still going to be on the board. And under Smith, we would have to take that into account in looking at what you'd have to look at the new board. And so, Your Honor, I think you would have to look at Levinson, but I still don't think it's dispositive. Because what's been lost in the briefing, quite frankly, Your Honor, is Miles. And Miles is not a defendant, but he was on the board since 2006. He's still on the board today. And so he would not have been able to dispassionately look at these claims either. He was just as implicated as the other six board members who were on the board since 2006. But you would agree that if we look at the second amended complaint, that we would look at – we would look at – would not look at Mr. Levinson? I would not agree with that, Your Honor, because – Exactly, Your Honor. Because Smith was a case where the plaintiffs timed the complaint to make sure that that director stayed in. There is no situation that we did that here. So I would keep Levinson absolutely in, Your Honor. There was no gamesmanship from either side. Okay. I mean, I understand your position. I thought with Levinson, he had – the director had announced months before the first amended complaint that he'd be retiring on May 12, 2016. Your Honor, I – it's possible. I don't know standing here today when he exactly announced the retirement. And certainly it was not on our mind when we filed the supplement and when the court ordered us to file the second amended complaint. Well, is Levinson key to your having a majority of the board of directors? And if not, why not? The answer is no, Your Honor. If you count the directors, we have Ersic. We have Devitra since 2006. We have Greenberg since 2006. We have Holden since 2006. We have Mendoza since 2006. We have Miles since 2006. And we have Levinson since 2006. So that's seven. Seven out of 12. Let me explore a little bit with you your understanding of what the pleading requirement is in this case. Is it enough for you to allege that the board was inadequate or ineffective in implementing the anti-money laundering program? No, Your Honor. It's not. What I need to allege, and I believe we have alleged in our complaint, is a failure to act in the face of a known duty to act. Evidence in conscious disregard. Well, when you say failure, that can be a relative term. Is it a complete failure? I mean, in your reply brief at one point you say the board made no good faith effort to change anything. It seems like a pretty absolute claim. Is that what you have to, do you have to allege facts to support that in your complaint? Right. I have to allege facts that support bad faith, Your Honor. And so. Support what? Bad faith. All right. And so when you look at the situation here, right, what we have alleged is the board is informed and has admitted knowing about serious problems breaking the law, facilitating money laundering by brutal criminals. They know this. Okay. What is a board supposed to do when they know they have a duty to correct this? They're supposed to do something. What do they do with the areas outside the southwest border area? As far as we can see, nothing, Your Honor. That is not okay. Under Scott v. Rear and all those other cases, Rosenblum, FISA, not okay to do nothing. If you then look at within the southwest border region, what we have alleged is the board remained wholly passive knowing that they had a duty to act. That, Your Honor, is sufficient on a daily basis. So your reading of your own complaint, then, is that you've alleged facts showing that the board took no affirmative steps whatsoever. Is that your position? Your Honor, that's absolutely right. And actually, I think it bears out. I did a word count. I think it's like passive appears at least 18 times. If you add did, knew, do anything, it comes about 25. So we, throughout the complaint, say that the board remained wholly passive based on our review of the minutes. Well, I guess that's what I'm trying to understand is, again, failure and passive can be totally passive, complete failure, or it could be, well, they might have done some, but they didn't do enough. And that could be construed as failure or passive. And I just want to make sure I'm understanding what you think you've alleged. Right. What I think we've alleged is outside the southwest border area, the board did absolutely nothing. What we've alleged within the southwest border area is that the board remained wholly passive. And if you look at the minutes that the defendants would like you to look at, that they submitted as part of the appellate record, okay, what you will see is, and we've alleged this in the complaint, is that they did remain passive. The way a board operates, you probably know this, they pass resolutions. They say, I hereby pass a resolution telling management to do X, Y, Z. Go through all the minutes. They're partial and they're redacted, but go through everything that the defendants have put in. There are no resolutions at all, even within the southwest border region, telling management comply with the law, work with the monitor, make sure that you have an approved plan. There are no minutes. But the monitor was part of the approved plan. I mean, they had essentially a consent decree where they had to do certain things to bring their oversight into compliance. And if you look at the minutes, it's not perfect and it maybe takes longer than you think, but I don't think you can say that they did nothing. So, Your Honor, I respectfully disagree because there are no resolutions saying comply with the monitor. In fact, what we know from the complaint is that management continued to fight with the monitor. They actually had a lawsuit against the monitor and there are no resolutions from the board then saying, look, guys, we should really work with this monitor because we're supposed to get into compliance. Well, but on the other hand, counsel, I take it you wouldn't contend, would you, that Western Union was required to comply with everything the monitor told them to do. I mean, there's got to be some opportunity for back and forth or the FTC, for that matter, the DOJ. Is Western Union supposed to say, we'll do anything you want and that's that? No, Your Honor. You seem to be making this argument, though, that the fact that they resisted some of the demands is somehow helpful to showing that you didn't have to make the demand. Your Honor, so, no, of course they don't have to comply with every demand. That would be silly. I mean, you have a court-approved monitor to help you with compliance. I'm trying not to be, but you've made the argument that because they resisted the demands, that for some of the demands, that for some reason that eliminates the demand requirement in your lawsuit. And let me respond to that, Your Honor. It wasn't just some demands. Look at the background of this case. They know since 2002, 2006, 2008, 2010, that they don't have an effective AML compliance program as required by law. The monitor comes in and the monitor says, look, I'd like to look at your trading information for WUVS, right, the subsidiary. And the purpose of the monitor is to make sure that Western Union gets into compliance. But your complaint, as I read it, says that a literal reading of the SBA supports management's interpretation of the scope. So you admitted that it was a reasonable interpretation of the agreement that they took. Actually, no, Your Honor. If you look at the complaint, and I think it's paragraph 77 or so, but it says a literal reading might support that. But what they are supposed to do, and know that they're supposed to do since 2010, is make sure that Western Union has an effective AML compliance program. So even if a literal reading would have supported it, it's not good faith for the board to support management's fighting with the monitor when the overarching goal is get an effective AML compliance program because you're facilitating money laundering by brutal criminals. I guess I'm still wrestling a little bit, though, with the pleading standard. So you're talking about an effective anti-money laundering program. But what about a program that maybe isn't as good as it should be? Maybe it's even significantly deficient, but it isn't a zero. We don't have a completely ineffective program. We have a program that maybe you claim is a deficient one, but is that going to do it for you? Your Honor, the answer really is what they were supposed to do is stop the law breaking. And so it can never be a perfect program. But there were very basic things that the court of reminders said, look, this is what you've got to do. Put in place a risk assessment. He said that in 2010. They didn't have one in 2013. Okay. It's not about being perfect. It's about continuing, committed, continuing lawful, willful law breaking by Western Union for years while the board knew it had a duty to fix it. And at the same time, a record where the board remained wholly passive in the face of this known duty. That is a clear conscious disregard claim under Rosenblum, Pfizer, FECO, Westmoreland, Massey Energy, all the cases that we cited. Show that a board cannot just sit back and let it all happen when they know it has a duty to actually correct law breaking. And again, it's not just some technical requirements, Your Honor. By not having an effective AML compliance system program, they are facilitating brutal criminals launder their money. That's not okay. Counsel, you're over time. I apologize, Your Honor. Thank you, counsel. So much for reserving time. Thank you. Good morning, Your Honors. May it please the Court. My name is David Graham, and I represent the Applee Directors. Let me start out by just coming back to what this case is all about and has been all about. For plaintiffs to show that demand on Western Union's board was excused in this case, they were required to plead particularized facts showing that a majority of the board members, all but one of whom were outside independent directors, intentionally and knowingly violated their fiduciary duties. The Delaware Supreme Court is absolutely clear on that. In the Stoneview Ritter case, they said that imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligation. The district court here correctly held that the complaint didn't come close to meeting that rigorous standard and did not contain particularized facts showing some intentional breach of fiduciary duty by these board members. Now, I want to start by answering your question, Judge McHugh, regarding the standard of review here. In one of the few areas where I agree with my colleague on the other side, I agree it doesn't make a difference ultimately. However, the standard of review is and should be of use of discretion. And let me explain why that's so. That's not only a matter of the fact that this circuit has previously held that it's an abuse of discretion standard, and there's a circuit split on this. It's about four to five, I think. It's almost down the middle in terms of the split. It really goes back to the United States Supreme Court. This is not a matter where courts are riding on a blank slate. If you take a look at the U.S. Supreme Court's decision in Daily Income Fund v. Fox, 464 U.S., 530, at Note 5, the court there specifically observed, this was back in 1984, that courts in considering derivative cases and courts of appeals had historically applied an abuse of discretion standard. That's really the end of the ballgame. And the reason that that's the end of the ballgame is because the U.S. Supreme Court has also made clear in Pierce v. Underwood, 487 U.S., 552, at page 558, that when, as here, there is a long history of appellate practice such that a historical tradition exists, that is the definitive answer to the question as to whether or not review should be de novo or abuse of discretion. And here there was a long history of practice, as the United States Supreme Court in the first case I mentioned, the Daily Income Fund case, has, and as this circuit has had. And that's not surprising, because derivative cases grew out of equity. If you take a look at, in fact, the Supreme Court rules pre-equity, pre-demerger of equity in 1938, derivative cases were treated as being equitable cases in that. And because of that, because equitable determinations were typically treated as abuse of discretion. So this isn't a matter where we're riding on a clean slate with policy preferences. This is a matter where there has to be a uniform rule, regardless of what the State law is, for what Federal courts of appeals will use as their review standard. And the U.S. Supreme Court has made clear that when there is a history in that regard, that's the end of the inquiry. The second question you asked, Your Honor, was which board. And I want to address that one, too, because actually several things that my colleague on the other side said were just incorrect. So the First Amendment complaint is the one that was filed at the time that Linda Levinson, it was Ms. Levinson, was still on the board. And Ms. Levinson had announced she was leaving the board in March of 2016. The proxy statements had come out already at that point as to who's going to be re-nominated. In fact, that announcement came out before Judge Krieger dismissed the initial complaint. It happened that the day following that announcement, Judge Krieger happened to dismiss the original complaint. So when you get to the time that the complaint, the amended complaint, the First Amendment complaint is filed, which was in the beginning of May, it's known that Ms. Levinson is about to leave the board. Now, my colleague says, well, that doesn't really count, even under the Delaware Supreme Court case, the Smith case that Your Honor referred to, because that case was about motivations. To the contrary, Your Honor, if you take a look at this Park case, you'll see the Court explicitly held that it was not a matter of their finding that there were any ill motivations by the plaintiff's counsel in terms of the time of their filing. Instead, it was a functional, pragmatic analysis saying we want to make sure that the board that's actually going to address these issues is the board that we're considering. And when somebody's about to leave the board, clearly they don't count. So it wasn't a motivational matter. Well, it's not just they're about to leave. In that case, it was four days. That is right. In that case, it was four days. In this case, it was ten days. Well, ten days from the second amended, right? No, ten days from the First Amendment complaint, Your Honor. Ten days from the First Amendment complaint. The First Amendment complaint was filed on May 2nd. The board meeting where the directors were changed over was May 12th of 2016. So, you know, that, you know, takes care of Ms. Levenson. Although, candidly, it should be the second amended complaint. Now, my colleague on the other side tries to, you know, diminish the importance of the second amended complaint as if, oh, it was just some technical amendment. The First Amendment complaint was all about the alleged failure to comply with the Southwest Border Agreement and that it went over the time it was supposed to take. The second amended complaint was the one that brought in the Deferred Prosecution Agreement, the FTC proceedings, all the stuff which they say, well, the company has admitted willful violations. So saying that the second amended complaint is some irrelevancy, let's just get rid of the Deferred Prosecution Agreement and the consideration of this case in the FTC, that just blatantly contradicts. The plaintiffs themselves have argued in their briefs here. And the reason that that's important is because the Delaware courts have also made clear that when, as here, there is a motion to dismiss the First Amendment complaint, which there was, and then there's a subsequent amendment before that motion is decided, you go back and you take a look and you say, well, was it unlikely that that First Amendment complaint was going to survive? So should we really consider the second amended complaint in the board at that time? Now, why does all of this matter? Here's one. And again, my colleague got the facts wrong. Counsel, you've got to stay close to the mic. Sorry about that. We can hear you, but I'm sure the people in back would like to hear you, too. There were 11 board members as of the time of the filing of the second amended complaint, the same 11 at the time of the filing of the First Amendment complaint with the exception of Ms. Levinson, who was a 12th. Of those, six board members joined the board 2012 or later. Three of them joined in the period of 2015-16. They're not named as defendants. Three of them joined in 2012 or 13. One of them joined, Ms. Townsend, joined in August of 2013. Plaintiffs don't say a word about her. And in their reply brief, they have a footnote that attempts to address this argument, footnote 10. They don't even attempt to defend the allegations that her joining in August of 2013 somehow makes her having done something wrong. The remaining two that joined, joined in 2012. One attended his first board meeting in September 2012, which, by the way, is a significant date, because the Deferred Prosecution Agreement, which they cite, specifically says that the company instituted meaningful improvements to compliance by at least September of 2012. And the other one joined, Mr. Trujillo, earlier in the year 2012. You will look in vain for any particularized allegation in the complaint that says a word about any of these individuals, the specific meetings that they were at, and what they supposedly did that was a deliberate breach of fiduciary duties. There is nothing. And they're not around in the earlier periods. So you've got three defendants who are from 2012-2013. You've got three who aren't even named from 2015-16. That's a majority of the 11-person board that counts, whether you look at the Second Amendment complaint. So now that brings me to the other merits that are involved here. And I just want to focus on a few things that my opponent said. You know, first, you know, Judge Matheson, you asked about, you know, their claim here, and what is the nature of the claim, the nature that they were, quote-unquote, wholly passive in connection with this. You know, fortunately, this isn't a matter where counsel's characterizations are what determine. What determines is the factual record, including the facts, the documents that were incorporated by reference from the complaint, because the complaint spent a hundred paragraphs going through meeting by meeting based upon the materials that were then provided in the record. And you simply can't look at those materials and square them with the notion that this is a board that was, quote-unquote, wholly passive. You know, in fact, you know, I think that, you know, perhaps the most instructive case, and there are a variety of them, but, you know, one that I'd like to single out for the Court is the Citigroup case, you know, by way of comparison to this. That's the Oklahoma firefighters case that was decided by the Delaware Chancery Court in 2017. The Duke Energy case is also highly relevant. But just take a look at the facts there. In the Citigroup case, over a five-year period, Citigroup was the subject of numerous orders and consent decrees, all relating to AML compliance deficiencies that were first identified and ordered to be remedied by the Office of the Control of Currency in 2010. Over the succeeding years, federal and state authorities repeatedly found that Citigroup had not complied with that order, and there were three additional consent decrees that were entered, with each one finding that there was continued noncompliance with the earlier orders and consent, and indeed, in the two years following the third consent decree, which was entered into in March of 2013, the Board actually continued to receive reports, which have no parallel here, of continued illegality in the running of the Citigroup system because there were unremedied deficiencies. Notwithstanding all that, the Court said, if I take a look at the documents that you reference in the complaint, yes, the Board was informed of deficiencies, but there were clearly plans being made and attempts being made to address it. And the fact that those didn't succeed, that doesn't tell me that you have a knowing breach of fiduciary duties. It tells me, at best, you have a failure, and that's not sufficient for these purposes. So, too, here. In fact, our case is actually an a fortiori, because you will look in the record that's here, and notwithstanding the references by appellants and their briefs, the characterizations, you won't find a single instance in which the Board is told of a noncompliance with legal requirements that is ongoing. Yes, the Board was aware of it. The pleading standard again. I'm sorry. The pleading standard, the Delaware courts have referred to the term reasonable doubt, that the complaint has to raise a reasonable doubt about the disinterestedness of the Board. And in Massey, Vice Chancellor Strine says this is a plaintiff-friendly pleading standard. What are we to make of this reasonable doubt language that shows up in the cases? So, I'll be perfectly honest, Your Honor. I don't think it's pellucid in terms of what reasonable doubt means. And, yes, that was Vice Chancellor Strine when he was serving on the Chancery Court. There are other cases which we've quoted since that time which say, in fact, it's a reasonable, excuse me, it's a rigorous standard that we cited in our brief. I think the place you need to look is the Delaware Supreme Court's decision in Wood v. Baum, where they say a reasonable doubt, it's at footnote 11, cited in our brief. They say a reasonable doubt that a majority of directors is incapable of considering demand should only be found where a substantial likelihood of personal liability exists. Now, what's a substantial likelihood? It's not having to show that it's more likely than not. It's also something more than the mere Rule 8a pleading standard. It falls somewhere in between, meaning that there has to be substantial factual basis. I think that that's the answer. But it's not one of these things one can pin with precision. Before I finish up, I just want to mention a couple of other things. You know, there was this notion of management having fought. As we point in our brief, out of the hundred recommendations that the Monitor had, there were only two where there was a quote-unquote fight, both of which, as Judge McHugh observed, and as the district court specifically pointed out, both of which the plaintiffs themselves conceded were defensible positions based on a literal interpretation. And even if you thought the company was wrong, hiding two out of a hundred has nothing to do with anything. For example, the Western Union business, that's a business-to-business subsidiary, has nothing to do with any of the violations in the deferred prosecution agreement or in the other ones. There was also a reference to no risk assessment. That's just constant characterizations, and it's flat-out wrong. For example, and we pointed this out in our brief, not only don't you need to have a risk assessment, a risk assessment is a document saying in what areas do we face risk. That doesn't mean you're noncompliant with the laws. In fact, the very documents that they cited show that there was a risk assessment. One example, and we cited others, is on page, it's a document that starts at A1352 from May 2011, which specifically refers to the fact that a global risk assessment had been performed at A1356. So not only does this have nothing to do with noncompliance, the fact of the matter is that it was done in any event. I see that I've exceeded my time. And unless the Court has other questions, we would ask that the district court's opinion be affirmed in its entirety. Okay. Thank you, counsel. I appreciate the argument. I appreciate the arguments of both counsel. The case will be submitted, and counsel are excused.